Brassard, J.
This matter concerns the Commonwealth’s petition for the civil commitment of the defendant, Earl W. Toland, as a sexually dangerous person (SDP), under G.L.c. 123A, §§1, 12-16, as amended by St. 1999, c. 74. The matter is now before the court for a determination of probable cause to believe the defendant to be sexually dangerous. The court conducted a probable cause hearing on April 12, 2000, and heard testimony from Dr. Cornelius F. Kiley.[1] Upon consideration of the testimony of Dr. Kiley, and the admitted exhibits, the court FINDS that the Commonwealth has not shown probable cause to believe Toland to be sexually dangerous, and ORDERS that this petition be DISMISSED.
FINDINGS OF FACT
The facts underlying the indictments, as gleaned from the police reports, are summarized as follows.[2] The victim is Toland’s biological daughter. When the investigation that led to the criminal convictions began, in September 1995, the victim was seven years old. The victim indicated to police investigators that, at times when her mother was in the shower or putting *686 her (the victim’s) brother to sleep, Toland would enter the victim’s bedroom and lie down next to the victim and would undress her. Toland would put his hands on the victim’s genital area, and would penetrate the victim’s vagina with his fingers. Toland also placed his tongue in the victim’s genital area. Toland also penetrated the victim with his penis and had sexual intercourse. The victim stated these incidents occurred numerous times. The victim indicated that Toland offered her money ($30 to $35) to allow him to perform the acts, though the victim never received any money. Toland also told the victim not to tell her mother about the acts, though Toland did not threaten the victim. The victim stated that Toland began performing these acts on February 17, 1995 (approximately seven months before the investigation began), when they moved into a new home. Toland acted this way in Massachusetts and in Maine, where they had vacationed for one week during the summer. The victim stated that Toland had become increasingly impatient and violent toward her since the sexual abuse began.
An abuse prevention order was taken out against Toland. Toland indicated he wanted to remove his clothing from the house, which the order allowed him to do with prior notice and the presence of a police officer. An arrangement was made whereby the victim’s mother would drop Toland’s clothes off at the Hanson police station. Nevertheless, half an hour later Toland went to the victim’s house, and was arrested for violating the abuse prevention order.[3] When he was arrested, Toland told police officers that he needed help from a psychiatrist.
Toland was indicted for two counts of rape of a child (G.L.c. 265, §23), assault with intent to rape a child under 16 (G.L.c. 265, §24B), two counts of indecent assault and battery on a child under 14 (G.L.c. 265, § 13B), and violation of a protective order (G.L.c. 209A, §7). Toland pled guilty on all counts. He received a sentence of three and one half years to five years at MCI-Cedar Junction on one of the indictments for rape of a child (ind. no. 97315), five years of probation to commence upon release from Cedar Junction on the other rape of a child indictment (ind. no. 97316), a sentence of three to four years at Cedar Junction (concurrent with the sentence on ind. no. 97315) on the indictment for assault with intent to rape a child under 16 (ind. no. 97317), and five years of probation to commence upon release from Cedar Junction for the two indictments for indecent assault and battery on a child under 14 years (ind. nos. 97318 and 97319). Toland also pled guilty to the indictment for violation of a protective order (ind. no. 97320), and this was placed on file with Toland’s assent. The relevant conditions of Toland’s probation on indictments nos. 97316, 97318, and 97319 are as follows: sexual offender counseling as ordered by the probation department and no unsupervised contact with the victim or the victim’s siblings or any children under 14 years of age.[4]
On February 2, 2000, the Department of Correction (DOC) notified the Plymouth County District Attorney’s Office that Toland’s anticipated release date was April 1, 2000. On March 22, 2000, the District Attorney’s office brought this petition to commit To-land as an SDP. On March 29, 2000, the court (Chin, J.) denied the Commonwealth’s motion to detain To-land temporarily pending a probable cause hearing, and Toland was released. Toland appeared before the court again on April 12, 2000, for his probable cause hearing. Dr. Kiley, who testified as the Commonwealth’s witness, was the sole witness to testify before the court. His testimony, which I credit, is summarized below.
Dr. Kiley was retained by the District Attorney’s office. Dr. Kiley did not personally speak with Toland, and based his expert opinion on certain documents he reviewed.[5] These documents include: police department reports and documents (Exhibit 1), a certified copy of the record of Toland’s conviction (Exhibit 2), Toland’s Board of Probation record (Exhibit 3), DOC records (Exhibit 4), DOC sex offender treatment status reports (Exhibit 5), and DOC and Justice Resource Institute (JRI)[6] documents relating to Toland (Exhibit 6). Based on his review of these documents, and his training and experience, Dr. Kiley’s opinion was that Toland may be sexually dangerous. Dr. Kiley did not specify whether he believed Toland may suffer from a “personality disorder” or a “mental abnormality,” as defined in the statute, G.L.c. 123A, §1.
Dr. Kiley testified that the convictions underlying this petition show Toland to be an incestuous offender, one who commits sex offenses within the family. He also testified that certain information in the documents he reviewed suggested Toland to have committed sexual offenses outside the family context, which, if true, would mean that Toland committed other sexual offense(s) against adult(s) or child(ren). Taken in combination, the intra- and extra-familial offenses led Dr. Kiley to conclude that Toland may be sexually dangerous. Had there only been the first type of offense, the intra-familial offenses (i.e., the convictions underlying this petition), Dr. Kiley would be reluctant to say that Toland meets the standard for being a sexually dangerous person. See footnote 9, infra.
The reason that the intra-familial offenses, standing alone, make Dr. Kiley reluctant to believe that Toland may be sexually dangerous has to do with the nature of the offense. Dr. Kiley testified that an incest offender is a different type of offender than a rapist or a pedophile, because the dynamics are different. Incestuous offenses are typically caused by intra-famil-ial psychological issues, such as the child victim, in the mind of the offender, becoming a type of substitute mother/wife figure to the offender. In contrast, pedo-, philes are indiscriminate, choosing victims from throughout the community. Because pedophiles attack a variety of victims, they are more likely to *687 reoffend. Incest offenders, since their victims are of a very specific type, are less likely to reoffend, if the incestuous offense was heterosexual in nature. A pedophile, in short, is a danger to the entire community if sexually dangerous. An incestuous offender may pose a risk to family members, depending on whether strictures are in place in relation to the offender’s access to the victim.[7] Dr. Kiley agreed that there is nothing in the records he reviewed to show that Toland has an ongoing relationship with the victim or her mother.[8] Dr. Kiley’s opinion is that given Toland’s incestuous behavior, if he actually committed extra-familial offenses, depending on the circumstances of those offenses, Toland may be sexually dangerous.[9]
Dr. Kiley based his belief that Toland may have committed extra-familial offenses on several documents in the record he reviewed. There are three references to such a possibility in the records, at least one of which is a quotation of another. A JRI document titled “Intensive Treatment Program” contains the handwritten notes of an undetermined individual, which state in relevant part (as reasons Toland was moved to Phase III from Phase IV of a treatment program): “Work on offender cycle given that he is an extrafamiliar [sic] offender rather than just an incest offender.” See Exhibit 5, last page. Another document, which appears to be from the DOC and states it was prepared by a Patricia Johnston (whose position has not been determined), quotes the language above. See Exhibit 4, penultimate page. A third document, from the DOC and titled Sex Offender Treatment Status Report, dated November 1999 and giving the name of “Lazarre Simckes, Ph.d” (sic), quotes the above language and adds: “When he was the focus member he had difficulty receiving feedback on his minimization, but by the end of the session he stated that he now realized how his deviant fantasies were linked to his offending behavior within and without the family context.” See Exhibit 5, penultimate page. These three documents are the only evidence on which Dr. Kiley relied to believe that Toland may have committed offenses outside the family.[10] Dr. Kiley agreed that the evidence of extra-familial offenses was cursory at best.[11]
In addition to whether there were any extra-familial offenses, Dr. Kiley testified that other factors speaking to recidivism are: the number of victims (the more victims, the more likely the offender will reoffend), the number of offenses (the more offenses, the more likely the offender will reoffend), whether the victim was male (if the victim was male, the offender is more likely to reoffend), whether the offender was married, the offender’s criminal history, and the level of sexual aggression.
Toland’s criminal history, apart from the Massachusetts convictions underlying this petition, is scant. There is some evidence in the record to indicate that Toland was charged with breaking and entering and burglary in May 1978 in West Virginia.[12] See Exhibit 3 (Federal Bureau of Investigation (FBI) record). There is also evidence he was charged with simple possession of marijuana in October 1987 in South Carolina. Id. It is unclear from the record whether Toland was actually convicted of these offenses.[13] Dr. Kiley testified that he has seen far worse criminal records, and agreed that there were no prior sexual offenses in Toland’s record.
As for the level of sexual aggression Toland used in the offenses against his daughter, Dr. Kiley stated that there was no “gratuitous aggression” in that no weapon was used, Toland did not strike the victim or beat her, and he did not tie or bind her.
Toland underwent sex offender treatment while incarcerated.[14] Toland progressed from Phase I of the program to Phase IV,[15] and then was returned to Phase III.[16] The reasons given for Toland’s termination from Phase IV and return to Phase III were that Toland “minimized aspects of his anger and intimidation [and] withheld information about the extent of his abuse.” See Exhibit 5, last page. The termination was upheld after an Appeal Hearing, and Toland was instructed to work on the offender cycle because he is an extra-familial offender. Id. Dr. Kiley testified that such a termination and return to a previous level is the norm, and not unusual.
Dr. Kiley testified that, while he was not familiar with the specific model of therapy Toland received, in general to progress from one phase to the next, a treatment provider would probably encourage full disclosure on the part of the inmate of information not fully known by the therapist.
Dr. Kiley reviewed DOC records provided to him by the Commonwealth, and those records were admitted into evidence. See Exhibit 6. Those records are summarized as follows. Toland was committed to MCI-Concord on October 8, 1996. He was transferred to MCI-Norfolk on April 24, 1997, where he received sex offender treatment. On October 8, 1998, Toland was transferred to the Massachusetts Treatment Center, and he remained there for the balance of his sentence.
There are numerous DOC Sex Offender Treatment Status Reports in Exhibit 6. While they use different designations, they generally follow a three-point scale. A “1" is a good score, and ”3" is a bad score, and a “2" is somewhere in between. A ”4" indicates that the element is not applicable, and a “5" means the score is uncertain. On one report dated, June 9, 1997, Toland received eleven ”ls," two “2s,” and one “3" (indicating Toland should begin a relapse prevention plan). A report dated November 1999, shows that Toland received three ”ls" and eight “2s,” with the remaining components not being applicable. A February 2000 report gives Toland three “Is,” eight “2s,” and no “3s.”
*688 Several reports were undated. One showed that Toland received three “Is,” six “2s,” and six “3s.” Toland received one of the “3s” under the category of “Demonstrates ability to control deviant sexual arousal via behavioral techniques” and one “3" under ’’Displays positive & appropriate sexual attitudes toward adults & children." Another undated report gives Toland 10 “Is,” three “2s,” and one “3" (with respect to developing a relapse prevention plan).[17]
Exhibit 6 also contains more descriptive reports. One such report dated September 28, 1998, states that Toland had entered Phase III of the sex offender program, having completed Phases I and II, and “is a very active group member and has done some good work on the justifications and minimization he had around his offense. Needs to begin a relapse prevention plan.” The report stated that Toland’s prognosis for future behavior was good, if he remained in treatment. Another report, dated June 1999, states that Toland “participated actively in class discussions and was candid as he discussed his struggles with self esteem. He demonstrated an understanding of concepts discussed in class and completed all assignments. It is hoped that he will continue to work toward integration of a healthier self concept.” Another such report (undated) notes that Toland recently began Phase III and that Toland’s “attendance and participation have been consistently good. He is beginning to get an understanding of the causes of his offense.” A document dated May 25, 1999, states with respect to sex offender treatment that Toland “was often angry and withholding of information early on, however, later he has been able to openly and honestly talk about his issues. [Toland] attends AA, Domestic Violence, Self Esteem Development and is a unit runner.” The writer (apparently one H.C. Marrow) concludes by recommending that Toland remain at MTC and continue sex offender treatment.
Toland does not appear to have generated a significant disciplinary record while incarcerated. He received two “d” reports for smoking paraphernalia (tobacco) and breaking glass. He also had one administrative transfer for unspecified “staff issues.” A document dated September 25, 1998, states that Toland receives good housing evaluations and receives good work reports (working Monday through Friday, 3:00 am to 10:30 am), and uses the gymnasium in his spare time. His security classification, as of September 25, 1998, is designated as “higher.” Toland’s score on the classification form was a “7.” Lower security levels are listed as encompassing 0-4 points, and higher classification is for 5-37 points. A document included in Exhibit 4 (the letter from the DOC notifying the district attorney of Toland’s upcoming release) lists an inmate’s last three disciplinary actions. The sheet only contains two for Toland, one stating that Toland received a warning on January 3, 1998, and the other showing that Toland paid restitution and received five days extra duty for an August 3, 1997 offense. It is unclear whether these correspond to the two “d” reports Toland received. The sheet also indicates that Toland has no escape history, received no visits at the treatment center (but kept in contact with “family”[18] by mail and telephone), and has no current mental health issues (except, presumably, for the sex offender treatment).
Dr. Kiley also testified about a “Relapse Prevention Plan.” He stated that such a plan, designed to prevent future sexually offending behavior, is greatly beneficial and a useful tool, though some offenders do not reoffend even without such a plan. Based on his review of the records, Dr. Kiley testified he could not recall Toland ever having a Relapse Prevention Plan in place.
Dr. Kiley testified about victim empathy programs, which allow a patient to place himself in the shoes of victims, to help him feel for the victims. Dr. Kiley said this is a powerful deterrent.
Dr. Kiley testified about anger management programs, which he characterized as a factor in decreasing the risk of reoffense, but more so with rapists than pedophiles.
RULINGS OF LAW
Definition of a Sexually Dangerous Person
General Laws c. 123A, §1, as amended by St. 1999, c. 74, defines an SDP as:
[A]ny person who has been (i) convicted of or adjudicated as a delinquent juvenile or youthful offender by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility; (ii) charged with a sexual offense and was determined to be incompetent to stand trial and who suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility; or (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires.
In this case, there is no evidence that Toland was ever “charged with a sexual offense and was determined to be incompetent to stand trial.” There is also no evidence that Toland was “previously adjudicated as [an SDP].” The Commonwealth is proceeding solely on the first definition of an SDP. Thus, the Commonwealth must show probable cause to believe that (1) Toland was convicted of a sexual offense,[19] (2) Toland suffers from a “mental abnormality”[20] or “personality disorder”[21] and (3) as a result of that mental abnor *689 mality or personality disorder Toland is likely to engage in sexual offenses if not confined to a secure facility.
Probable Cause Standard
The legislature set out the standard which the Commonwealth must meet at this stage in G.L.c. 123A, §12(c):[22]
Upon the filing of a petition under this section, the court in which the petition was filed shall determine whether probable cause exists to believe that the person named in the petition is a sexually dangerous person . ..
In addition to the right to notice of the probable cause hearing, at the hearing the defendant has the right to appear and to contest probable cause, the right to counsel, the right to present evidence and cross-examine witnesses, and the right to view and copy all petitions and reports in the court file. G.L.c. 123A, §§12(c) and 12(d).
The statute does not define “probable cause.” The term “probable cause” has different meanings in different contexts. See Matter of Grand Jury Investigation, 427 Mass. 221, 224 (1998) (discussing various definitions of probable cause). Because the current c. 123A has not yet been interpreted by the Supreme Judicial Court or the Appeals Court, and because this court must now decide whether the Commonwealth has sustained its burden at the probable cause hearing, the court must decide what quantum of evidence the legislature intended that the Commonwealth present at this stage.[23] For the reasons discussed below, the court is persuaded that the appropriate standard is that used during probable cause hearings before a district court under G.L.c. 276, §38, and Mass.R.Crim.P. 3.
As noted, the term “probable cause” denotes a variety of standards against which a court is to weigh evidence. The essence of the definition of probable cause can be found in Black’s Law Dictionary 1219 (Deluxe 7th ed. 1999): “A reasonable ground to suspect that a person has'committed or is committing a crime or that a place contains specific items connected with a crime.”[24] This basic definition, a reasonable ground to suspect or believe, serves as the foundation for “probable cause” in a number of civil settings.[25]
In the criminal context in Massachusetts, there are essentially two basic definitions of probable cause applied in different settings. The more familiar standard determines whether there is probable cause to arrest. Probable cause to arrest exists where the facts and circumstances in the arresting officer’s knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that the person arrested has committed or was committing an offense. E.g., Gerstein v. Pugh, 420 U.S. 103, 111 (1975); Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992). This standard is used to determine the sufficiency of the evidence before a grand jury with respect to an indictment. Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982). This is also the standard applied when a person has been arrested without a warrant, and is not released on bail or recognizance, and the determination is made by a judicial officer rather than the police. Jenkins v. Chief Justice of Dist. Court Dep’t, 416 Mass. 221, 232 (1993) (person arrested without a warrant entitled, prior to extended pretrial detention, to determination by judicial officer of probable cause to believe person committed the offense).[26]’ [27]
A different definition of probable cause applies during probable cause hearings under G.L.c. 276, §38. When a defendant is charged with a criminal offense, over which the district court lacks or declines jurisdiction, and the Commonwealth elects not to proceed through indictment by a grand jury, the Commonwealth must satisfy the standard of Myers v. Commonwealth, 363 Mass. 843, 850 (1973), in order for the defendant to be bound over for trial before the Superior Court. Under this standard, called the “directed verdict” rule, the minimum quantum of evidence the Commonwealth must present is more than that for probable cause to arrest but less than that needed to prove the defendant’s guilt beyond a reasonable doubt. Id. The court must also determine whether the Commonwealth has “sufficient competent legal evidence to justify ... a full trial.” Commonwealth v. Look, 379 Mass. 893, 904 (1980) (quoting Myers, 363 Mass. at 849) (ellipses added by Look court).[28] “The examining magistrate should view the case as if it were a trial and he were required to rule on whether there is enough credible evidence to send the case to the jury . . . [He] should dismiss the complaint when, on the evidence presented, a trial court would be bound to acquit as a matter of law.” Myers, 363 Mass. at 850. When considering a motion for a directed verdict (now termed a motion for a required finding of not guilty, see Mass.R.Crim.P. 25), the question is whether, viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential aspects of the crime beyond a reasonable doubt. Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). A question of guilt cannot be left to conjecture or surmise, Commonwealth v. Gilbert, 423 Mass. 863, 868 (1996), or to the piling of inferences upon inferences, Commonwealth v. Armand, 411 Mass. 167, 170(1991); Commonwealth v. Caterino, 31 Mass.App.Ct. 685, 690 (1991).
The Supreme Judicial Court has made clear that “there is a ‘large difference’ between probable cause to arrest [or search] and probable cause to bind over, ‘and therefore a like difference in the quanta and *690 modes of proof required to establish them.’ ” Myers, 363 Mass. at 849 (quoting Brinegar v. United States, 338 U.S. 160, 173 (1949)) (bracketed words by Myers court).
The higher standard applied in G.L.c. 276, §38, probable cause hearings is “designed to establish an effective bind-over standard which distinguishes between groundless or unsupported charges and meritorious prosecutions.” Myers, 363 Mass. at 847. The probable cause hearing’s “primary function is to screen out at this early but critical stage of the criminal process those cases that should not go to trial, thereby sparing individuals from being held for trial, and from being unjustifiably prosecuted!.]” Id. at 847. See also Commonwealth v. Ortiz, 393 Mass. 523, 534 (1984) (purpose of probable cause hearing is to screen out cases that should not go to trial); Juvenile v. Commonwealth, 375 Mass. 104, 106 (1978) (same); Burke v. Commonwealth, 373 Mass. 157, 159 (1977); Stefanik v. State Bd. of Parole, 372 Mass. 726, 731 (1977) (same). Thus, while a judicial finding of probable cause to arrest validates the initial decision to arrest a suspect, a greater quantum of evidence is needed to justify the costs to the defendant and the Commonwealth of a full trial, to insure that the screening function of the preliminary hearing is properly effectuated. Myers, 363 Mass. at 849. Though the Commonwealth has no duty to present its entire case at the probable cause hearing, it must present enough to allow a reliable determination of probable cause to be made. Look, 379 Mass. at 904.
As this makes clear, the G.L.c. 276, §38, probable cause hearing’s primary function, to screen out “an erroneous or improper prosecution," Myers, 363 Mass. at 852 (quoting Coleman v. Alabama, 399 U.S. 1, 9 (1970)), envisions that the judge’s role is more than de minimis. ”[T]he judicial role in pretrial screening involves weighing and judgment rather than a wooden comparison of the testimony with the elements of the crime. Although credibility ordinarily is a matter for the jury, and it is not expected that judges will normally resolve testimonial conflicts at the preliminary hearing, cases do occasionally arise in which a witness’s testimony is so weak or contradicted by sufficiently clear facts that the judge should have the power to dismiss the case.” Myers, 363 Mass. at 853 n.12 (quoting American Law Institute, A Model Code of Pre-Arraignment Procedure (Tent. Draft No. 5) §330.5(3)) (alteration by Myers court). Thus, a judge may find a lack of probable cause where, though the Commonwealth has presented evidence as to the elements of the crime charged, other evidence or testimony on cross-examination leads the judge to disbelieve the Commonwealth’s witnesses. Myers, 363 Mass. at 853.
Because of the similarities of c. 123A and c. 276 probable cause hearings, namely, their statutory bases, their structural positions in the pretrial process, their impact on a defendant, and the protections afforded a defendant at both hearings, the court is persuaded that the proper standard to apply in c. 12 3A hearings is the Myers standard. This was the standard applied in Commonwealth v. Wilson, Civil No. 99-4877 (Middlesex Super. Ct., Borenstein, J.).[29] Neither statute defines what is meant by “probable cause.” See G.L.c. 276, §38 (“A defendant . . . may elect a probable cause hearing in accordance with [Mass.R.Crim.P. 3] . . .”); Mass.R.Crim.P. 3(c)(2) (providing for transmission of papers “[i]f the defendant is bound over to the Superior Court for trial after a finding of probable cause . . .”); G.L.c. 123A, § 12(c) (quoted above).
At a c. 276, §38, probable cause hearing, the defendant is entitled to the assistance of counsel, the right to confront and cross-examine witnesses, an impartial fact finder, and the opportunity to present evidence. G.L.c. 276, §38. A defendant is entitled to analogous rights under c. 123A, §§12(c) and 12(d). In contrast, an accused is entitled to none of these rights when a determination of probable cause to arrest is made by a magistrate issuing an arrest warrant or when a suspect is held in custody for an extended period following a warrantless arrest. See Jenkins, 416 Mass. at 233-45 (no right to be present or be represented by counsel, and probable cause determination may be made in ex parte, informal proceeding prior to arraignment). Most of these rights are also inapplicable with respect to grand jury proceedings. See, e.g., Commonwealth v. McNary, 246 Mass. 46, 51 (1923).
The c. 123A probable cause hearing occupies a pretrial position similar to the c. 276, §38, probable cause hearing. The c. 276 hearing is held after a complaint is filed, an accused is arraigned, and the pre-trial detention determination is made, and before a defendant is bound over to the Superior Court in anticipation of trial. Similarly, the c. 123A hearing is held after the Commonwealth files a petition for civil commitment as a sexually dangerous person, after a determination is made regarding temporary detention pending a probable cause hearing, and before a defendant is committed to the Treatment Center in anticipation of a jury trial.
As is the case with a defendant charged with a criminal offense, the result of a probable cause hearing has significant consequences as to the substantive rights of a defendant alleged to be sexually dangerous. A finding of probable cause under c. 123A results in a defendant being committed to the Treatment Center for up to 60 days for examination and diagnosis by qualified examiners, and potential lifetime commitment thereafter. Just as the screening function of the Myers bind-over standard serves to spare defendants “from being held for trial, and from being unjustifiably prosecuted,” 363 Mass. at 847, so should that stan *691 dard serve to spare defendants, who have already served committed sentences for their crimes,[30] from being further detained and tried on insufficient evidence.[31]
To be sure, there are differences between a c. 276 probable cause hearing and a c. 123A probable cause hearing. The most notable of these differences is that the c. 276 hearing occurs during the course of a criminal prosecution, while c. 123A proceedings are civil proceedings. Nonetheless, given the panoply of procedural protections afforded a defendant by the statute, the government agency charged with prosecuting c. 123A petitions, the heightened burden of proof at trial (beyond a reasonable doubt), the substantive consequences to a defendant of a verdict that he is sexually dangerous, and the Commonwealth’s own argument during the probable cause hearing (that because these proceedings are looked upon as resembling criminal proceedings, the rules of ethics governing prosecutors in criminal cases should apply),[32] the court is not persuaded that labeling these proceedings “civil” should result in any lesser burden at the probable cause stage. Cf. Sheridan, Petitioner, 422 Mass. at 777-78 & n.3. The lower probable cause burden applied in some civil contexts (described above) operates in proceedings with far lesser potential consequences for a defendant than the potential lifetime commitment of c. 123A, and a party in those proceedings is not afforded the panoply of statutoiy protections granted by c. 123A.
Another difference is that certain hearsay is admissible at a c. 123A trial (and thus also, presumably, at a probable cause hearing). G.L.c 123A, § 14(c) (court, probation, psychiatric and psychological, and police records, as well as victim’s statements, and “any other evidence” relating to sexual dangerousness admissible at trial). This difference, though, is not so substantial as to compel a conclusion that the Commonwealth need only meet a minimal burden at a probable cause hearing. In hearings under c. 276, the rules of evidence “should in general be the same rules that are applicable at the criminal trial.” Myers, 363 Mass. at 849 n.6. However, the Supreme Judicial Court advised that added exceptions to the hearsay rule could be developed, if it appears desirable to insure an effective probable cause hearing. Id. The nature of the facts to be evaluated at a c. 123A hearing, whether a defendant is sexually dangerous, is, perhaps, more amenable to consideration of reliable hearsay testimony (at least at the probable cause stage) than the facts at issue in a typical criminal prosecution (did the defendant commit the crime, are the witnesses credible, etc.). Seen in this light, admissibility of hearsay does not alter the court’s perception of a c. 123A probable cause hearing as being analogous to a c. 276 hearing.
The legislature, in enacting the recent amendments to c. 123A, intended a probable cause hearing to be a real and important proceeding, and not an “empty ritual,” Myers, 363 Mass. at 851, where a witness or witnesses appear pro forma and the conclusion is foregone, as would be the case under a very low probable cause standard. See id. (“If the examining magistrate could simply rest his finding of probable cause on the ipse dixit of the prosecution, there would be little need for defence counsel’s presence”). This is underscored by the procedural protections afforded the defendant (notice and opportunity to be heard, right to counsel, right to present evidence, and right to cross-examine witnesses) and the other provisions affording protections analogous to those used in criminal prosecutions. Rather than bringing convicted sex offenders directly to trial, the legislature chose to provide a probable cause hearing, implementing careful procedures and setting out the rights to be afforded a defendant.[33]
In this case, the Commonwealth has failed to satisfy its statutory burden to present enough evidence to establish probable cause to believe that Toland remains sexually dangerous. While the Commonwealth has satisfied this burden with respect to conviction of the requisite predicate offenses, the evidence that it has put forth (in the light most favorable to the Commonwealth) is insufficient for a reasonable jury to find, beyond a reasonable doubt, the essential facts that would establish sexual dangerousness: that Toland has a “mental abnormality” or a “personality disorder,” as those terms are defined in the statute, making him “likely” to engage in sexual offenses if not confined.
The Commonwealth’s expert witness, Dr. Kiley, never testified that he believed Toland to suffer from a mental abnormality or personality disorder. Dr. Kiley did not state that Toland was likely sexually dangerous or was probably sexually dangerous. The most Dr. Kiley was willing to state was that he believed Toland may be sexually dangerous, if there were extra-familial offenses and if any such offenses were sufficiently grave. It is unclear to the court whether the statutory definitions of a “mental abnormality” or “personality disorder” were used as a basis or as bases for Dr. Kiley’s significantly qualified conclusion. Dr. Kiley’s conclusion was, at best, uncertain, and highly tentative. To say that a given person “may” be sexually dangerous, if certain facts are established, would not permit a reasonable jury to conclude — beyond a reasonable doubt — that the person is “likely” to offend again if not confined.
While the tentativeness of this conclusion may not itself defeat a finding of probable cause, when added to the Commonwealth’s meager evidence of the alleged acts which form the crucial support for that conclusion, the coúrt is forced to conclude that probable cause does not exist to believe Toland to be sexually *692 dangerous. Dr. Kiley was “reluctant” to reach even the tentative conclusion he did reach based only on the acts which led to Toland’s underlying convictions. It is only when the alleged extra-familial offenses are added to the equation that he is “inclined to recommend” that Toland “may be” sexually dangerous. There are some documents in the record that reference extra-familial offenses.[34] These references are, however, ofihand. Because they are the only evidence of any such offenses, the degree to which the documents merely quote or paraphrase each other (or some other document not in the record) is unclear. Not only are these documents hearsay, they are hearsay on hearsay. Although perhaps admissible, they are entitled to little weight. Furthermore, they are extremely vague. They contain absolutely no details about the offenses, if there were any offenses. None of the information that Dr. Kiley says he needs in order to conclude that Toland may be sexually dangerous, the frequency, time frame, nature, and gravity of the alleged offenses, is presented.
The links in the chain of reasoning the Commonwealth presented to the court are each too weak for the court to use to hold Toland. The court does not believe that the legislature intended that individuals be deprived of their liberty for up to 60 days for examination, and be faced with a jury trial that could lead to indefinite (and potential lifetime) commitment, on the basis of a tentative opinion premised on unreliable totem pole hearsay evidence of events so cursorily described.
Even if the appropriate standard to apply at this stage is the lower probable cause standard, that needed to arrest, the Commonwealth has also failed to satisfy this standard. It is a critical part of the Commonwealth’s case, through Dr. Kiley’s testimony, that Toland committed extra-familial offenses and that those offenses were of sufficient gravity, frequency, and nature. On the evidence the Commonwealth has put forth, the court cannot, with reasonable caution, believe that Toland committed any extra-familial offenses and that the details of those offenses were of a dimension sufficient to satisfy the concerns Dr. Kiley expressed. The Commonwealth’s evidence could not lead a person of reasonable caution to believe that Toland remains sexually dangerous.
The court is mindful of the need, expressed by the legislature, to protect the public from sexually violent predators. See St. 1999, c. 74, §1. The court is also mindful of the statutory precautions the legislature put in place, to guard against casting too wide a net. The legislature determined that not every person convicted of a sex offense was, for that reason alone, a sexually dangerous person, and it placed the burden on the Commonwealth to prove elements in addition to conviction, at trial, beyond a reasonable doubt. The legislature also determined that a probable cause hearing would further legislative goals, by screening out those petitions the Commonwealth was unable to support, thus saving valuable public resources for use in other cases. The Commonwealth, for all the reasons discussed above, has failed to sustain its burden at this probable cause stage.
ORDER
For the reasons stated above, the court FINDS that there exists NO PROBABLE CAUSE to believe the defendant to be a sexually dangerous person. Therefore, it is ORDERED that the Commonwealth’s petition for civil commitment of the defendant be DISMISSED.

Defense counsel filed, on the morning of the probable cause hearing, a brief motion to dismiss the petition, as well as other motions in limine. She handed the same to the assistant district attorney that morning as well. Defense counsel, apparently intentionally, did not press the motion to dismiss at the hearing, and the Commonwealth has not yet filed an opposition brief. Neither side has argued the matter, and the motion to dismiss is not in any meaningful way before the court at this time.

The court ruled that the police reports were admissible at the probable cause stage. See Exhibit 1. The statute provides that, assuming probable cause has been found, police reports are to be supplied to the qualified examiners (defined in G.L.c. 123A, §1) at the Massachusetts Treatment Center, G.L.c. 123A, §13(b), and makes those reports potentially admissible at trial, G.L.c. 123A, § 14(c). Dr. Kiley considered the police reports in forming his opinion.

The police report of Det. Joseph Larkin states that Toland reported to the Hanson police station on September 8, 1995, at 8:33 (presumably am) and stated his desire to retrieve his clothing. The report then states that the police received a call at 9:00, stating that Toland had violated the abuse prevention order. See Exhibit 1 (police department reports and documents).

The docket entries for indictments nos. 97318 and 97319 refer to 97316 for the conditions of Toland’s probation. See Exhibit 2 (certified copy of the record for the listed indictments).

Dr. Kiley testified that there was no canon of professional ethics barring him from speaking with the defendant. The Commonwealth, though, believed it would be inappropriate for a Commonwealth witness to speak directly with the defendant, when the defendant was represented by counsel. The prosecutor argued that, because c. 123A is looked upon as having criminal overtones, a government witness speaking with a represented defendant on behalf of the government would be unethical. See Sheridan, Petitioner, 422 Mass. 776, 777-78 & n.3 (1996) (former c. 123A civil but due process protections, most of which associated with criminal practice, apply). See also Commonwealth v. Wilson, Civil No. 99-J-735 (Mass.App.Ct. Dec. 30, 1999) (Laurence, J., single justice) (Commonwealth urges application of criminal standard for motion to stay, in c. 123A case).

Dr. Kiley testified that the JRI is a vendor that provides sex offender treatment on behalf of the DOC.

Dr. Kiley summarized this aspect of his testimony in his report, which was introduced into evidence by the defendant, not the Commonwealth. See Exhibit 8 (Report of Qualified Examiner to the Court, dated April 1, 2000). In the report, at page 5, Dr. Kiley states:
Historically, it has been rare that incest offenders have been committed to the Treatment Center. In those instances in which this has occurred, there have been extenuating circumstances. For example, the offenses *693 committed by the incest offender have been violent or, in addition to the incest offenses, the perpetrator has committed extrafamilial offenses. There appear to be several reasons for the relatively low number of commitments in the case of incest offenders. One reason is the belief that the dynamics of these offenses are influenced by variables such as the relationship among the members of the offender’s nuclear family. Thus, a dysfunctional relationship between spouses, a lack of boundaries among family members, and a closed family system which fosters secrecy can contribute to sexual offending among family members. Another reason is the belief that the incest offender is less likely to recidivate than other sexual offenders whose offenses are extrafamilial. A third reason is the belief that the modus operandi of incest offenders is different from that of other pedophiles and rapists. The chief difference is in the degree of risk that they pose to the public. Although they are sexually attracted to children, incest offenders are seen as less likely to offend outside the home. To the extent that this is true, ex-trafamilial rapists and pedophiles pose a greater risk to the general public in that their pool of potential victims is much larger.

In its closing argument, the Commonwealth emphasized that there is no way of ensuring that Toland will not have access to his daughter, because he will be free and will go where he wants to go. Moreover, the Commonwealth argued, even if Toland does not have access to his daughter, the possibility exists that he will have additional children in the future.

In his written report. Dr. Kiley stated:
Mr. Toland has multiple convictions for incestuous sexual offenses. He, therefore, appears to satisfy one of the criteria necessary to be considered a sexually dangerous person [presumably, the first criterion, convicted of a sexual offense]. It is less clear to me if Mr. Toland meets the statutory criteria for mental abnormality and personality disorder. In [sic] these constructs are related to the pattern and scope of his sexual offenses as they bear on his risk to the general public, it becomes very important to have a detailed histoiy of Mr. Toland’s sexual history. The police reports which describe his sexual offenses provide information about the nature and frequency of his offenses as well as the time frame within which they occurred. In contrast, the two reports from the Treatment Center which mention that Mr. Toland committed ex-trafamilial offenses are cursory at best . . . [Dr. Kiley summarized the documents which suggest extra-familial offenses.] Neither of these reports provides information about the frequency, time frame, or nature of the ex-trafamilial offending.
The risk posed to the general public by an incest offender would be greater if he either offended against more than one close relative, or, if, in addition to incest offenses, he committed extrafamilial sexual offenses. The nature of the risk would be related to the gravity, frequency, and the period of time during which these offenses occurred.
In my opinion, if it can be shown that Mr. Toland has in fact committed sexual offenses involving individuals who are not closely related to him, and these offenses are sufficiently grave, I would be inclined to recommend that he may be a sexually dangerous person. If the alleged extrafamilial offenses cannot adequately be shown to have occurred, or are not of sufficient gravity, I would be reluctant to say that Mr. Toland meets the standard for being considered a sexually dangerous person.
Exhibit 8 at 5-6.

When asked whether there is a clinical psychological or psychiatric definition of the term “extra-familial," Dr. Kiley said he was using a dictionary “English language” definition, that the term means “outside the family.” In his written report, Dr. Kiley suggests that “extra-familial” means persons not closely related to the offender. See supra note 9.

Rn its closing argument, the Commonwealth pointed out that there is no evidence that Toland is simply an incest offender. The Commonwealth acknowledged that, since we do not have the facts of any extra-familial offenses, we do not know the identity of any alleged victim. The Commonwealth noted that nothing in the records the Commonwealth provided Dr. Kiley contradicts the records containing references to extra-familial offenses, a fact which the Commonwealth finds significant.

Toland was born in West Virginia. See Exhibit 1, page 1 (police department records). His date of birth is May 20, 1957. Id. Thus, at the time of the West Virginia charges, Toland was about 21 years old.

The FBI documents list the West Virginia and South Carolina offenses, but do not state the disposition. The same records also list the Massachusetts convictions for rape of a child and assault with intent to rape a child under 16, and state the prison sentence Toland received. This would tend to indicate Toland was not convicted of those out-of-state offenses or, if he was convicted, received no committed sentence. A DOC document entitled “Offender Face Sheet” also suggests Toland was not previously committed. See Exhibit 6 (document contains no data following “Prior Comm#,” which appears to mean “prior commitment”). However, a DOC document states that Toland received his GED in 1979 while committed to the West Virginia Correctional System. See Exhibit 4, page 5 (numbered “Page 2" at bottom). Another DOC document also references a prior commitment in West Virginia. See Exhibit 6 (document dated July 24, 1997).

It is not clear whether Dr. Kiley relied on Toland’s treatment record in forming his opinion. Dr. Kiley was quite explicit in his testimony that the two reasons for his opinion that Toland may be sexually dangerous were (1) the underlying convictions for incestuous behavior and (2) the indications in the documents that Toland could be an extra-familial offender, which increases the risk of reoffending because there would be a victim apart from Toland’s daughter and that victim would be outside the family. Dr. Kiley did not cite Toland’s prison treatment record as a basis for his opinion, though portions of that record were included in the documents Dr. Kiley reviewed. In his written report, Dr. Kiley does not rely on Toland’s prison treatment record. Nevertheless, since the evidence was presented to the court and since it appears relevant to the probable cause determination, the court considers this evidence.

Certilicates in the record (Exhibit 6) show that Toland completed Phase I on September 29, 1997, and completed Phase II in February 1998. He appears to have moved to Phase IV on November 24, 1998, and was moved back to Phase III on June 24, 1999. See Exhibit 4, page 6 (marked “Page 3").

While Dr. Kiley was familiar with the treatment given at the Massachusetts Treatment Center, he was not familiar with the therapy model used on Toland, and so appeared reluctant to state with certainly what Toland's treatment entailed.

To the extent that this may be at all indicative of the relative ages of the reports, the undated reports were handwritten, while the dated reports are typed/computer printouts.

There is no evidence that “family" includes the victim and/or her mother. The Commonwealth has presented no evidence that, while incarcerated, Toland in any way attempted to contact his daughter or her mother. DOC documents note that Toland’s mother, Norma Jean Thompson, who resides in Pennsylvania, is an emergency contact person. See Exhibit 6 (Offender Face Sheet).

A “sexual offense” is defined in G.L.c. 123A, §1, and includes the sexual offenses of which Toland was convicted.

A “mental abnormality” is “a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons.” G.L.c. 123A, §1.

A “personality disorder” is “a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses.” G.L. 123A, 81.

General Laws c. 123A, 813(a) provides:
If the court is satisfied that probable cause exists to believe that the person named in the petition is a sexually dangerous person, the prisoner or youth shall be committed to the treatment center for a period not exceeding 60 days for the purpose of examination and diagnosis under the supervision of two qualified examiners . . .

In Matter of Grand Jury Investigation, 427 Mass. at 224, the Supreme Judicial Court stated: “Our analysis of the claim of a constitutional violation is advanced only a little by stating that the Commonwealth must demonstrate probable cause. The more useful inquiry asks: of what must there be probable cause? In other areas requiring probable cause determinations, the answer varies depending on the circumstances.”

A “probable cause hearing” (also termed a “preliminary hearing”) is defined as: “A criminal hearing (usu. conducted by a magistrate) to determine whether there is sufficient evidence to prosecute an accused person. If sufficient evidence exists, the case will be set for trial or bound over for grand-jury review, or an information will be filed in the trial court.” Black’s Law Dictionary at 1199.

See, e.g., G.L.c. 19D, §5 (review of assisted living residences); G.L.c. 51, 847B (investigation of registrar of voters into possibly false statements in registration affidavit); G.L.c. 62C, §68(6) (appeal of decision of commissioner of revenue); G.L.c. 62E, §86 & 6B (investigation of fraudulent receipt of benefits under Commonwealth programs); G.L.c. 112, 887C 1/2 (investigations of conduct of public accountants); G.L.c. 119, 8839E & 39H (children in need of services proceedings); G.L.c. 150E, §11 (probable cause to believe violation of c. 150E determined by Labor Relations Commission); G.L.c. 15IB, §5 (probable cause for crediting allegations of a complaint before Massachusetts Commission Against Discrimination (MCAD)); and G.L.c. 231, 8894A, 94B, & 94C; Coblyn v. Kennedy’s, Inc., 359 Mass. 319, 326 (1971); Higgins v. Pratt, 316 Mass. 700, 769 (1944); Conway v. Smerling, 37 Mass.App.Ct. 1, 5 (1994) (probable cause in false imprisonment and malicious prosecution cases). See also Leduc v. Commonwealth, 421 Mass. 433, 435-36 (1995) (noting provision of G.L.c. 90, §24(1)(f)(2), relating to administrative license suspensions, states probable cause to believe licensee engaged in criminal behavior as prerequisite to suspension); A.R. v. C.R., 411 Mass. 570, 576 & n.9 (1992) (applying probable cause standard in civil case ordering blood testing to disprove paternity, but suggesting lesser standard may be sufficient in civil proceedings); Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990) (only notice of “likely cause," not “probable cause,” needed to start running of limitations period in negligence actions).
In addition, several Commonwealth administrative bodies have adopted a probable cause standard similar to the basic definition. See 103 Code Mass. Regs. §483.06 (1993) (DOC defines probable cause as: “Facts and circumstances which would lead a reasonable and prudent man to believe that: (a) A crime has been committed, is being committed, or is about to be committed; (b) A particular item or items of a seizable [sic] evidence of that crime presently exists; and (c) The item or items are presently in the location to be searched”); 120 Code Mass. Regs. §100.00 (1997) (parole board defines probable cause as: “An apparent state of facts found to exist upon reasonable inquiry which would induce a reasonably intelligent and prudent individual to believe that the parolee constitutes a danger to self or to the community, thus justifying the issuance of a parole warrant. . .”); 804 Code Mass. Regs. §1.15(7)(a) (1999) (MCAD defines probable cause as: “sufficient evidence upon which a fact-finder could form a reasonable belief that it is more probable than not that the respondent committed an unlawful practice”).

The accused does not have the right to be present or be represented by counsel. Jenkins, 416 Mass. at 233-45. The probable cause determination may be made in an ex parte, informal proceeding prior to arraignment. Id.

The probable cause standard is also applied in show cause hearings in the district court. G.L.c. 218, §35A (show cause hearings held when person is accused of misdemeanor and is not under arrest). The district court defines probable cause to mean a “reasonable belief’ that the accused has committed a crime. Standards of Judicial Practice: The Complaint Procedure, Standard 3:17 (District Court Administrative Office, June 1975). While the accused is entitled to notice of the accusation and an opportunity to present evidence (except in certain, specific circumstances, see G.L.c. 218, §35A), there is no right to a public hearing, no right to cross-examine witnesses, the rules of evidence do not apply, transcription of the proceedings is at the election and expense of the accused, an attorney’s participation is at the discretion of the magistrate, and the procedures are generally informal. G.L.c. 218, §35A; G.L.c. 221, §91B.

Thus, the standard used at a probable cause hearing under G.L.c. 276, §38, is more strict than the standard used to evaluate the sufficiency of the evidence before the grand juiy. As the Supreme Judicial Court has explained, this difference arises because the Myers standard is derived from statute and because there is a long history of sharply limited judicial review of sufficiency of the evidence in grand jury proceedings. Commonwealth v. O’Dell, 392 Mass. 445, 451-52 (1984).

In Wilson, the court used the lower probable cause standard, that needed to arrest, to evaluate the sufficiency of the evidence when the Commonwealth seeks the temporary detention of a defendant prior to a probable cause hearing.

Under G.L.c. 123A, §§12(a) and 12(b), the person against whom a petition is brought must be in custody (serving a sentence, committed to the Department of Youth Services, or otherwise held by an “agency with jurisdiction” (defined in c. 123A, §1, as an agency with authority to release a person)) at the time the petition is brought.

A defendant against whom probable cause is found under c. 276, §38, may be released on bail or recognizance pending his trial. There is no provision in c. 123A for a defendant to be released (or to be held anywhere except the Treatment Center) before trial, if probable cause is found.

See also Commonwealth v. Wilson, Civil No. 99-J-735 (Mass.App.Ct. Dec. 30, 1999) (Laurence, J., single justice) (Commonwealth urges application of criminal standard for motion to stay, in c. 123A case).

In contrast to the use of grand juries, there is no long history of sharply limited judicial review of sexually dangerous persons proceedings. Cf. O’Dell, 392 Mass. at 451-52. The c. 123A probable cause hearing, like that of c. 276, is set forth by statute.

The documents do not state whether the offenses which they purport to reference were sexual in nature. It may be a reasonable assumption that the documents implicitly state that the offenses were sexual.